[No. 26933. Department One. May 11, 1938.]

ELSIE E. MESSETT, *Appellant,* v. ISABELLA M. COWELL *et al., Respondents.*[1]

[1]Reported in 79 P. (2d) 337.

William A. Greene (*Evans, McLaren & Littell,* of counsel), for appellant.

*McMicken, Rupp & Schweppe* and *J. Gordon Gose,* for respondents.

GERAGHTY, J.—Henry Cowell agreed in writing to sell to one Boarman, for nine thousand dollars, a tract of land, embracing seventy-eight acres, containing a deposit of lime rock and situate on Orcas Island, in San Juan county. The land was sold subject to the condition that neither the purchaser nor his successors in interest should use any of the lime rock on the premises for the purpose of making or burning lime.

At this time, Cowell was extensively engaged in the production of lime in the state of California, and was owner of practically all of the stock in the Henry Cowell Lime and Cement Company, a corporation, then engaged in the manufacture of lime on a small scale on San Juan Island, a short distance from Orcas Island. He also owned approximately one-third of the stock of the Tacoma and Roche Harbor Lime Company, also engaged in the production of lime, but on a large scale, on San Juan Island.

Cowell died shortly after making the contract with Boarman, and the superior court of San Juan county ordered the administrator of his estate to make conveyance of the property to Boarman, in compliance with the contract. The administrator's deed contained the following restriction on the use of the property:

". . . that the party of the second part shall not nor shall any one claiming under him, make use of any of the lime rock situated on the above described property for the purpose of burning or making lime, and the party of the second part, by accepting this indenture and making the payments aforesaid, does hereby covenant and agree, that neither he nor any person claiming under him, or deriving title from him, shall ever make use of any of the lime rock situate on the above described property for the purpose of making or burning lime, and that in the event this agreement is at any time violated by the party of the second part, or by any party or person deriving title under him, that then and in that event the fee simple title to said premises shall revert to the heirs of Henry Cowell, deceased, their heirs and assigns. The party of the second part further covenants and agrees that the foregoing covenant not to use any lime rock on said premises for the purpose of making lime is a covenant running with the land and is a condition subsequent that shall be binding upon him and upon all persons deriving title to said premises under him."

The deed was duly recorded in the office of the auditor of San Juan county. Boarman's title subsequently vested in John H. McGraw and George B. Kittinger, as tenants in common, each owning an undivided one-half interest. The interest of Kittinger was sold for delinquent taxes by San Juan county in 1924, the county itself becoming the purchaser at the tax sale. The county later conveyed the Kittinger interest to Harriet Ray Westerman, who thereafter acquired title by deed from the successors in interest of John H. McGraw to the other undivided half interest. Title to the whole of the tract was later conveyed by John R. Compton, as the sole heir of Harriet Ray Westerman and as administrator of her estate, to Elsie E. Westerman, now Elsie E. Messett.

This action was instituted by the plaintiff, Elsie E. Messett, against the defendant heirs at law of Henry

Cowell to quiet her title to the tract by cancellation of the quoted restriction in the administrator's deed to Boarman. The amended complaint alleged:

"XII.

"That at the time of the execution of said contract and also of said deed Henry Cowell was not engaged in the lime business on Orcas Island or in the state of Washington to any considerable extent and that the protection afforded by said covenant was not necessary and was greatly in excess of any protection required by said Henry Cowell and that said restriction was unreasonable and far beyond any necessity or protection required by the business of said Henry Cowell.

"XIII.

"That the lime business of said Henry Cowell did not serve any extensive area, operated but a few months a year, produced but little lime and what lime was produced was sold in Tacoma and in the states of Oregon and California.

"XIV.

"That at the present time said Henry Cowell Lime and Cement Company does practically no business, operates but a few months out of the year, produces but 2,000 bbl. of lime annually, and confines its operations to Tacoma and to the states of Oregon and California; that at the present time there is no reason or justification for said restriction and that the said restriction is unreasonable.

"XV.

"That the only place in the state of Washington that the Henry Cowell Lime & Cement Company sells any lime is in the city of Tacoma, and any lime burned on the premises aforedescribed would in no way compete with the business of the said Henry Cowell Lime & Cement Company."

In their answer to the amended complaint, the defendants, after certain admissions and denials, prayed that the court adjudge the restrictions contained in the deed to be in all respects valid and binding upon the plaintiff and any successor in title to the real property

mentioned in the complaint. In its memorandum opinion, the trial court says:

"From the testimony it appears, among other things, that the Cowell interests possess a small plant for the burning of lime rock and the manufacturing of lime on San Juan Island; that the Roche Harbor Lime & Cement Company operate a very large plant of a similar nature and kind upon San Juan Island; that at the present time neither plant is being operated to its full capacity; that the Roche Harbor Company has facilities for manufacturing great quantities of lime; that the Roche Harbor Company has a ledge on San Juan Island containing vast quantities of lime rock; that the so-called Cowell interests also own a large and extensive ledge on San Juan Island; that the Cowell interests own two-thirds [one-third] of the stock of the Roche Harbor Lime & Cement Company; that lime is manufactured, as far as the Puget Sound area is concerned, exclusively on San Juan Island; that there are a number of other lime ledges in Northwestern Washington, some of them operated by cement companies for their own use but not for the burning or the making of lime; that lime rock is sold from various other ledges to the paper mills; that seemingly the manufacture of lime rock into lime is restricted to San Juan Island as far as Northwest Washington is concerned because of the fact that manufacture was first begun in this locality. . . . The Cowell interests are extensive manufacturers of lime in the state of California and seemingly their plant on San Juan Island is comparatively a small enterprise. It can, however, according to the testimony of Mr. George, the manager of the Cowell interests, be increased with a very small outlay of capital."

The decree entered by the court adjudged that the undivided one-half interest acquired by San Juan county on tax foreclosure, and subsequently sold to the plaintiff's grantor, was free of all the restrictions contained in the deed from the administrator of the Henry Cowell estate, but that the other undivided one-half interest was subject to all the provisions and restric-

tions concerning the use of the property contained in the deed,

". . . and that by reason thereof the plaintiff now has no right to use any of the real property hereinbefore described contrary to the said provisions, restrictions and conditions of said deed."

The plaintiff appeals.

The appellant first assigns error upon the court's refusal to enter judgment in her favor clearing her title as against the restrictive condition in the administrator's deed.

There is here no question of mistake or unfair dealing in the original engagement entered into for the sale and purchase of the land or in the inclusion of the restriction in the deed subsequently issued. It is to be assumed that the parties acted in good faith, and that Boarman accepted title subject to the restriction and with an intention to observe its limitations. Since the deed was placed of record, all subsequent purchasers took with notice, and accepted title accordingly.

The appellant, having voluntarily assumed the restriction, now seeks to have it avoided by the court as being an unreasonable restraint upon the use of the property and tending to the creation of a monopoly, and, therefore, against public policy. The ground upon which courts of equity have refused to enforce restrictive covenants and conditions is stated by Lord Mansfield in language often quoted:

"The objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this; *ex dolo malo non oritur actio*. No court will

lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa*, or the transgression of a positive law of this country, there the court says he has no right to be assisted. It is upon that ground the court goes; not for the sake of the defendant, but because they will not lend their aid to such a plaintiff." *Holman v. Johnson,* 1 Cowp. 341; 98 Eng. Rep. 1120.

Accordingly, relief from an obnoxious restriction is granted to the party who voluntarily assumes it, not because of any tenderness of the law for him, but because broad considerations of policy require it. While, as we have seen, the appellant, in her amended complaint, did not contend that a monopoly existed or that one was intended, but, on the contrary, alleged that the restrictive condition was not of benefit to the respondents, in her brief she argues strongly that one of the purposes of the restriction was the creation of a monopoly.

The respondents concede that the entire purpose of the restriction in the deed was to prevent the use of the property conveyed for the purpose of setting up a business which would compete with the one in which Cowell was engaged at the time in San Juan county. The restriction, having this purpose, was, of course, to some extent, a restraint on trade.

"The only limits imposed by the law on the owner of property restricting his power to exact contracts from a subsequent purchaser to refrain from using the property in a certain way are those imposed by public policy, and though public policy forbids unreasonable restraint of trade, and therefore forbids a system of contracts attempting to control prices on resale, there seems no reason why it should prohibit contracts which reasonably protect a business of either buyer or seller without tending to affect the public injuriously by monopoly or enhancement of prices." 3 Williston on Contracts, 2888, § 1642.

In *United Dye Works v. Strom,* 179 Wash. 41, 35 P. (2d) 760, where the court upheld an agreement by the seller of a wholesale cleaning and dyeing business not to re-engage in the business in the city of Seattle, the court states the rule:

"Upon the question of the enforceability of Strom's agreement, it may be observed generally that suits to enjoin breaches of negative covenants concerning a lawful subject matter are, of course, of equitable cognizance, whereby the validity of such contracts is gauged by the reasonableness of the restraint imposed, as necessary to the protection of the rights of the covenantee. 13 C. J., Contracts, p. 473, § 418. This same authority, continuing the discussion of the subject, says:

" 'This doctrine is founded on the idea that public policy requires that when a man has by his skill or by any other means obtained something which he wants to sell, he should be at liberty to sell it in the most advantageous way in the market, and in order to enable him to do so it is necessary that he should be able to preclude himself from entering into competition with the purchaser; and therefore the same public policy which enables him to do that should not forbid him from alienating what he wants to alienate, but should permit him to enter into any stipulation, however restrictive it may be, provided such restriction in the judgment of the court is not unreasonable, having regard to the subject matter of the contract.' "

In *Hodge v. Sloan,* 107 N. Y. 244, 17 N. E. 335, 1 Am. St. 816, the plaintiff's predecessor in title, Null, was the owner in fee of forty acres of land containing deposits of building sand. He had opened these deposits and was engaged in the business of selling the sand. The defendant's predecessor in interest, Sloan, sought to purchase a small parcel of the land, but Null declined to sell on the ground that, by the sale, he would be injuring his business and depriving himself of his living. Sloan agreed to purchase the land subject to a

restriction on his right to sell sand taken from it. A deed was executed and recorded embodying the restrictive condition; subsequently, Sloan conveyed the land to his son, who, with notice of the restriction in the conveyance, opened a pit on the land and proceeded to sell sand therefrom. Hodge, successor in interest to Null, brought suit to enjoin breach of the covenant in the deed.

The trial court found that the sand on the land retained by Null was sufficient to supply the existing demands of his business, as well as for all time to come. It was found further that the covenant was inserted in Sloan's deed to prevent competition in Null's business of selling sand and was in restraint of trade, contrary to public policy and void. In reversing the lower court, the court of appeals said:

"The conclusion of the trial court is against our ideas of natural justice, for it takes from one party an advantage which he refused to sell, and secures to the other without price a privilege which his grantor was unable to buy. Nor do we find that this denial of private right is required by any rule of public policy. Assuming with the respondent that the covenant is in restraint of trade, it is still valid if it imposes no restriction upon one party which is not beneficial to the other, and was induced by a consideration which made it reasonable for the parties to enter into it, or in other words, if it was a proper and useful contract, or such as could not be disregarded without injury to a fair contractor. . . .

"The subject of the contract at the bottom of this controversy was a piece of land which Sloan wanted to buy and which the plaintiff was willing to sell provided it should not be made an instrument for the destruction of his means of livelihood or detrimental to his business. The principle which favors freedom of trade requires that every man shall be at liberty to work for himself, and shall not deprive himself or the State of the benefit of his industry by any contract that he enters into. The same principle must justify a party

in withholding from market the tools, or instruments, or means by which he gains the support of his family, or if, as in the case before us, the instrument or means are susceptible of several uses, one of which will work mischief to himself by the loss or impairment of his livelihood, there is no reason of public policy which requires him upon a sale of the instrument to consent to that use, or prohibits him from binding his vendee against it."

Answering the contention that the covenant was an unreasonable restriction on the grantee's use of the land, the court continues:

"We see nothing unreasonable in the restriction which the grantee imposed upon himself. He was not a dealer in sand. He wanted to buy the land on the best terms and in the most advantageous way, and in order to do this it was necessary that he should preclude himself from so using it as that by its means he should enter into competition with the vendor. I cannot find that such a covenant contravenes any rule of public policy, nor that it is incapable of being enforced in a court of equity. It stands upon a good consideration, and is not larger than is necessary for the protection of the covenantee in the enjoyment of his business."

See, also: *Wakefield v. Van Tassell*, 202 Ill. 41, 66 N. E. 830, 95 Am. St. 207, 65 L. R. A. 511; *Natural Products Co. v. Dolese & Shepard Co.*, 309 Ill. 230, 140 N. E. 840; *Seeck v. Jakel*, 71 Ore. 35, 141 Pac. 211, L. R. A. 1915A, 679; *Rubel Bros. v. Dumont Coal & Ice Co.*, 200 App. Div. 135, 192 N. Y. Supp. 705; *Morris v. Tuskaloosa Mfg. Co.*, 83 Ala. 565, 3 So. 689; *Whealkate Mining Co. v. Mulari*, 152 Mich. 607, 116 N. W. 360, 18 L. R. A. (N. S.) 147.

Of the cases cited by the appellant in support of her position, the one most strongly in point is *Brewer v. Marshall*, 19 N. J. Eq. 537, 97 Am. Dec. 679. In that case, the owner of several tracts of land conveyed one of the tracts and, in the deed to his vendee, covenanted

that he, the grantor, his heirs or assigns, were not to sell any marl from the land retained by him adjoining the property conveyed. Later, a suit was brought to enforce this covenant by the successors in interest of the original grantee. Holding the covenant to be an unreasonable restraint, the court said:

"This is not a restriction on the use of the land, for the marl can be dug up and used upon the land; but the restriction is on the sale of the marl after it shall have been dug up. Marl of course is an article of merchandise, and the covenant restrains traffic in that article. It prohibits the sale of it at any time, in any market, either by the owner of the lands or by his assigns. Now it seems to me that this is a plain contract 'against trade and traffic, and bargaining and contracting between man and man.' That it is the rule that all general restraints of trade are illegal, has never been doubted since the famous opinion of Lord Macclesfield, in *Mitchell v. Reynolds,* reported in 1 *P. Wms.* 181."

The facts in that case are different from the facts in the present one. There, the restriction was not on the land conveyed, but on the grantor's use of the land that he retained. The grantor bound himself by an absolute covenant not to sell the marl for any purpose. Here, the use and sale of the rock is permitted for any purpose except the burning of lime, and the appellant is, in fact, quarrying and selling the rock for another use without any question of her right to do so. But, in any event, if there is any conflict between *Brewer v. Marshall* and *Hodge v. Sloan,* we are disposed to follow the rule announced in the latter case and the other cases in which the same principle is announced.

As far as the record discloses, Boarman, at the time he purchased the land from Cowell, was not engaged in the lime business, and the deposit of rock on the land was not in use for the manufacture of lime. Other than the restriction on his use of the rock for one particular purpose, Boarman's activities were otherwise unre-

stricted. He was under no limitations which would prevent his engaging in the lime business or from manufacturing lime generally. The restriction was one solely relating to the use of the tract of land conveyed to him. It was a restriction reasonable for Cowell to make for the protection of his own interest in the lime business. Boarman was left free, and his successor in interest, the appellant, is now free, to quarry and dispose of the rock for all other purposes; and the record discloses that the appellant, at the present time, is engaged in quarrying and selling lime rock to the pulp industry, which uses large quantities of lime and lime rock. The parties having freely contracted with respect to the use of the land, we are of the opinion that the use restriction imposed was not so materially in restraint of trade as to make the contract illegal.

Inconsistently with her contention that the restrictive condition tended to the creation of a monopoly, the appellant argues that, in view of the depressed condition of the lime business and the abundant facilities and extensive lime rock deposits owned by the respondents, or by corporations in which they are interested, no advantage can accrue to them by a continuation of the restriction.

We think the record fairly discloses that the existing condition of the industry is relatively unchanged from that existing at the time Boarman purchased the land. No question of public policy being involved, Cowell had a right to judge for himself what was necessary or best for the industry in which he was engaged; and the appellant, as the successor of Cowell's vendee, cannot, with reason, be heard to question the consideration on which the conveyance was made.

Paul H. McMillen, president of the Tacoma and Roche Lime Company, in which the respondents hold a one-third stock interest, testified that, while the lime busi-

ness generally in that area was not prosperous, and his company, as well as the other Cowell interests having land and facilities, had a sufficient quantity of lime rock deposits to supply their wants, yet that competition from a plant established on appellant's land would affect his company to some extent, as it would the small independent operations of the Cowell interests on San Juan Island.

When the Kittinger one-half undivided interest in the property was sold for taxes, a new title was initiated, freed from the restricted condition in Cowell's deed, and the trial court so held. However, in view of the fact that the appellant could not use the undivided half interest freed of the restriction from the undivided half subject to it, the court felt constrained to grant the prayer of the respondents' answer and forbid the manufacture of any of the lime rock into lime.

The appellant assigns error upon this provision of the decree and contends that the discharge of the restriction on the Kittinger interest by tax sale operated to discharge the restriction on the McGraw interest as well. In support of her position under this head, the appellant argues that the circumstances were so changed by the tax foreclosure that the enforcement of the restriction, even if permissible, would no longer benefit the respondents by restricting competition, and quotes from cases where it was held that restrictive covenants in deeds would no longer be imposed where property had meanwhile changed from residential to business. *Starkey v. Gardner*, 194 N. C. 74, 138 S. E. 408, 54 A. L. R. 806, and cases there cited.

The weakness of this position is that there is no change in the physical relation of the property here involved to the business interests of the respondents as the successors in interest of the original grantor. Even if it were possible to separate the undivided in-

terests so that only half of the property would remain subject to the restriction, there would still be a measure of benefit to the respondents. As the undivided interests are now merged and vested in the appellant, the restriction on an undivided half interest is necessarily operative on the whole, since no specific quantity or particle of rock can be identified as discharged from the restriction.

It is not the fault of the respondents that this condition obtains. The appellant argues that it was their duty to protect themselves by paying the taxes. They had no taxable interest in the property. The responsibility for the condition rests upon the appellant rather than respondents. She did not acquire title to the McGraw interest until sometime after purchasing from the county. She purchased the county's interest with knowledge of the state of the title and chose to acquire the other half interest with the consequences entailed by the existence of the restriction.

The appellant says that there are no cases holding that, where an undivided interest is freed from a restricting condition, the restriction stands as to the other undivided interest. That may be so, but we apprehend the appellant would find it equally difficult to find any authority in support of her own position.

The appellant calls attention to the apparent inconsistency of the decree, in which one paragraph adjudges the undivided half interest to be free of the restriction, and in another paragraph adjudges that, by reason of the existence of the restriction on the undivided half, no part of the rock may be used for lime by the appellant.

The court was confronted by a problem hard to express in a formula, but there is no inconsistency in its judgment, since, in the first place, the restriction on an undivided interest necessarily made it impossible to

use any part of the whole without a breach; and, in the second place, in taking conveyance of the McGraw interest, the appellant subjected the whole of her interest in the property to the restrictive covenant or condition in the Cowell deed.

Another view of the facts militates against the appellant's contention. Her predecessor in interest, Harriet Ray Westerman, took title from the county to the Kittinger interest in October, 1925; she took the interest discharged of the restriction. Title to the McGraw interest was taken in April, 1928. When she took title to this interest, she assumed the restriction contained in the original deed from Henry Cowell that she would not "make use of any of the lime rock situate on the above described property for the purpose of making or burning lime." She thereby subjected the whole of her title to the restriction, with only the qualification that, for a breach of condition, the respondents would be limited to a forfeiture of the McGraw undivided interest.

We are of the opinion that the judgment of the trial court was correct and should be affirmed.

STEINERT, C. J., HOLCOMB, MAIN, and SIMPSON, JJ., concur.